**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASA STEINARSDOTTIR a/k/a ASA STEINARS**, Plaintiff, v. **TRIPSCOUT, INC.**, Defendant. | Case No. 23-cv-1528 (CRC) **Public Version of ECF No. 106** |

## MEMORANDUM OPINION

Imitation may be the sincerest form of flattery. But taking another's copyrighted work and showcasing it to millions on Instagram and TikTok without permission can also amount to copyright infringement. In this long-running copyright dispute between an Icelandic lifestyle influencer and a company that promotes tourism through a large network of social media accounts, each side has moved for summary judgment. For the reasons explained below, the Court grants in part and denies in part both motions.

### I. Background

#### A. Factual Background

The following background is predominantly taken from the parties' statement of material facts that have been admitted by the other party. See ECF No. 91–18, Pl.'s Resp. to Def.'s Statement of Facts ("Pl.'s Resp."); ECF No. 95–1, Def.'s Resp. to Pl's Statement of Facts ("Def.'s Resp."). Where there is disagreement, the facts are drawn from the evidence presented viewed in the light most favorable to the non-movant.

Plaintiff Asa Steinars is an Icelandic content creator with over 1 million followers on her Instagram profile, @asasteinars. People flock to her page to see photographs and short-form

videos showcasing her native country's landscape and all there is to do there, including kayaking among icebergs, zip-lining over glaciers, and submerging in hot springs. See Def.'s Resp. ¶¶ 2–4. Many of her posts have been registered with the United States Copyright Office. Id. ¶ 5. Steinars makes a living by licensing her work, collaborating with brands and promoting their products in her posts, and marketing Iceland-related tourism opportunities. ECF No. 91–17, Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF") ¶¶ 5, 8, 10–11. The last revenue stream consists of commission earned on tours and hotels booked through links on her Instagram page. See ECF No. 89–8, Def.'s MSJ, Ex. F ("Steinars' Interrogatories") at 4.

Steinars works closely with her husband and business partner, Leo. Def.'s Resp. ¶ 6. Although Steinars always picks when, where, what, and how to shoot, if she is featured in the content, Leo serves as the cameraman. See Pl.'s SUMF ¶¶ 12–19. Leo also helps run two companies Steinars started to support her content-creation and tourism-advice services: Katla Creative and Communia Limited. Id. ¶¶ 7–8. Katla Creative, in particular, is involved in licensing Steinars' works to interested parties. Id. ¶ 9. Over the years, Steinars has partnered with and created content for many globally recognized brands, including Samsung, Audi, Mercedes, Icelandair, 66 Degrees, and Parajumpers. See ECF No. 91–2, Steinars Decl. ¶ 12.

Tripscout is a U.S. company whose business model also depends on attracting online attention. Tripscout owns and operates hundreds of travel-related social media accounts across several platforms. Def.'s Resp. ¶¶ 21, 25, 34. Its accounts include the Instagram accounts @iceland.explore, @outdoor, and @spectacular.norway and the TikTok account @iceland.explore (collectively, "the undisputed accounts"). Id. ¶ 50. Tripscout also owns @hotel, a hotel-booking platform that it promotes on its social media pages. The travel accounts steer users to @hotel through links in their bios, and Tripscout earns commissions when users

make bookings there. Id. ¶¶ 22, 25, 35. Tripscout is thus always on the hunt for captivating travel-related content to post on its pages, hoping to convert increased user traffic into more bookings and, in turn, more revenue. Id. ¶¶ 39–40, 44.

Tripscout employs a few American employees and a network of overseas contractors, many of whom work in Egypt, to operate its pages. Pl.'s Resp. ¶ 4; Def.'s Resp. ¶¶ 23, 25. Tripscout's staff posts thousands of travel-related pieces of content per day, much of it taken from other creators. Pl.'s SUMF ¶¶ 39, 44. Tripscout provides its staff with detailed instructions on how to run the accounts, including a step-by-step playbook for reaching out to creators and getting permission to use their content. Id. ¶ 33. If a creator does not want one of Tripscout's accounts to repost her work, however, Tripscout "red flags" the creator in its internal system—a designation meant to stop staff from contacting that creator or posting her content on any of Tripscout's pages. Def.'s Resp. ¶ 59.

Beginning in 2017, when Steinars had about 47,000 Instagram followers, Tripscout's accounts began republishing her content. Pl.'s Resp. ¶ 15. Steinars did not object. At times, when Steinars received an automated direct message ("DM") reporting that one of Tripscout's accounts had reposted her content, she responded with a heart emoji. ECF No. 89–10, Def.'s MSJ, Ex. H at 4, 6–7. She even once commented with three heart emojis on one of Tripscout's reposts. Id. at 5.

Things changed in March 2021 after Steinars' follower count had ballooned to 434,000. Pl.'s Resp. ¶ 16. Steinars told Tripscout, in no uncertain terms, that the free ride was over. Tripscout's unauthorized use of her videos and images, Steinars said, violated U.S. copyright law, and Tripscout did not have permission to use any of her works unless and until the parties reached a licensing agreement. See Def.'s Resp. ¶ 57; ECF No. 91–8, Pl.'s MSJ, Ex. 4 ("Pl.'s

Emails") at 1, 7. Steinars also demanded €54,000 for Tripscout's past unlicensed uses of her work and warned that, absent timely payment, litigation would follow. Id.

Tripscout rebuffed the demand, believing Steinars' case would not "hold up in court." Pl.'s Emails at 7. It did, however, take Steinars' works down from its pages. For a time. Before long, works from Steinars' Instagram page began reappearing on Tripscout's accounts. Pl.'s SUMF ¶ 64. All told, her content was posted on Tripscout's pages on at least eight more occasions—including twice after this litigation began. ECF No. 91–16, Pl.'s MSJ, Vera Decl. Ex. 4 ("Pl.'s Waliszewski Tr.") 170:24–171:11; ECF No. 89–7, Def.'s MSJ, Ex. E ("Def.'s Infringement Table") at 9. And despite having designated Steinars as a red-flagged creator after she objected to the repostings, Def.'s Resp. ¶ 58, Tripscout's staff continued to reach out to her, requesting permission to use her content multiple times and asking how much she would charge to promote content on Tripscout's behalf, Pl.'s SUMF ¶¶ 49, 60–62.

No one seems to know for sure who posted Steinars' content on Tripscout's pages over the years. Id. ¶ 65. Tripscout insists that only a closed universe of contractors could have done so—all of whom work from Egypt or elsewhere overseas. Def.'s Resp. ¶¶ 25, 65. Tripscout's U.S.-based employees, however, also have access to the accounts and occasionally make posts. See Pl.'s SUMF ¶¶ 28–31. But in general, the employees and its founder and CEO, Konrad Waliszewski, simply review posts made by the foreign contractors. Def.'s Resp. ¶ 32.

B. Procedural Background

Steinars sued Tripscout for copyright infringement in 2023. See ECF No. 1, Compl. ("Initial Compl.") at 1. After Steinars filed her Second Amended Complaint ("SAC"), Tripscout moved to dismiss based on two of its affirmative defenses: that the statute of limitations had run and that Steinars licensed the use of her works by agreeing to Instagram's Terms of Use. The

Court denied the motion and granted Steinars leave to file one final amended complaint. See Steinarsdottir v. Tripscout, Inc. ("Steinars I"), No. 23-cv-1528 (CRC), 2024 WL 1532587, at *5 (D.D.C. Apr. 9, 2024). Steinars' ensuing Third Amended Complaint ("TAC") alleged that Tripscout unlawfully copied 41 of her copyrighted works on 53 occasions and requested actual damages and profits or statutory damages as redress. ECF No. 26, TAC at 21–22. Infringement Nos. 1–8 and 10–53 occurred on accounts that Tripscout admits owning. See id. Ex. 1 at 1–5. Infringement No. 9 was found on an Instagram account named "antarcticaexplores." Id. at 1. The parties dispute whether Tripscout has ever owned or operated this account. See Pl.'s SUMF ¶ 50; Def.'s Resp. ¶ 50. Tripscout later responded to the TAC with counterclaims for fraudulent inducement, unjust enrichment, and tortious interference with contract. See ECF No. 38, Def.'s Answer & Counterclaims. The Court dismissed those counterclaims for failure to state a claim. See Steinarsdottir v. Tripscout, Inc. ("Steinars II"), No. 23-cv-1528 (CRC), 2025 WL 485415, at *1 (D.D.C. Feb. 13, 2025).

Discovery was a mess, with both parties failing to preserve relevant evidence in ways that prejudiced the opposing side. Tripscout deleted many of the allegedly infringing posts rather than archiving them. With the posts went their performance analytics—the very data Steinars needed to measure Tripscout's indirect profits from the infringements. Steinars made a similar blunder. She deleted messages that might have shown when she first learned of the posts—a fact central to Tripscout's statute-of-limitations defense. The Court sanctioned both sides. In the event the case goes to trial, the Court concluded, the jury will get the chance to consider the spoliation of evidence when assessing the parties' credibility and rendering its verdict. ECF No. 86 ("Sanctions Op.") at 9, 18.

With the evidentiary record set, Tripscout has now moved for summary judgement on all of Steinars' claims and a couple of its affirmative defenses. See ECF No. 89, Def.'s Mot. for Summ. J. ("Def.'s MSJ"). Steinars opposes that motion and has filed a cross-motion for partial summary judgment on the issue of Tripscout's liability for all Infringements but No. 9—i.e., the post that was found on the disputed account. See ECF No. 91, Pl.'s Opp. and Cross Mot. ("Pl.'s MSJ"). Those motions are now ripe.

## II. Legal Standards

"When faced with cross-motions for summary judgment, this Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Fam. Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (cleaned up). In considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court, in other words, must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent." FTC v. Meta Platforms, Inc., 775 F. Supp. 3d 16, 33 (D.D.C. 2024) (cleaned up).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). If the moving party meets that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). To defeat summary judgment, the non-moving party

must do more than rely on the mere allegations or denials in its pleadings; it must instead support its opposition with affidavits, declarations, or other competent evidence demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(c); Am. President Lines, LLC v. Matson, Inc., 775 F. Supp. 3d 379, 394 (D.D.C. 2025). A fact is "material" if it can affect the outcome of the litigation. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute over material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. So neither unsupported speculation nor evidence that is "merely colorable" or "not significantly probative" will suffice to defeat summary judgment. Id. at 249. And if the opponent fails to bring forth facts showing that "reasonable minds could differ" on a material point, id. at 250, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," id. at 248, summary judgment shall be granted.

## III. Analysis

Again, both parties have moved for summary judgment. The Court first grapples with the threshold question of whether Tripscout infringed Steinars' copyrights in the United States, as is required for liability under the Copyright Act. It then assesses the three elements of Steinars' claim of direct infringement. Next, the Court considers the two affirmative defenses—that Steinars licensed her works to Tripscout and that her claims are barred by the statute of limitations—on which Tripscout seeks summary judgment. Finally, it tackles which categories of damages, if any, Steinars may recover.

### A. Domestic Infringement

The parties agree that the Copyright Act, like most federal laws, "has no extraterritorial application." Spanski Enters., Inc. v. Telewizja Polska, S.A., 883 F.3d 904, 913 (D.C. Cir. 2018). But they dispute *who* bears the burden of proving (or disproving) domestic conduct. See

Def.'s MSJ at 6; Pl.'s MSJ at 8–9. The D.C. Circuit has made clear that U.S.-based infringement is a threshold "element . . . which must be proven before relief can be granted" for copyright infringement. IMAPizza, LLC v. At Pizza Ltd., 965 F.3d 871, 876 (D.C. Cir. 2020) (quoting Litecubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1368 (Fed. Cir. 2008)). So Steinars, "as the plaintiff, bears the burden of establishing a domestic violation of the Copyright Act." Motorola Sols., Inc. v. Hytera Commc'ns Corp., 108 F.4th 458, 473 (7th Cir. 2024).

A "permissible domestic application" of the Copyright Act takes place if "conduct relevant to the statute's focus occurred in the United States." Spanski, 883 F.3d at 913 (quoting RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 337 (2016)). The "focus" of the Act is "protecting the exclusivity of the rights it guarantees" to copyright holders. Id. at 914. This includes the exclusive rights to (1) reproduce copyrighted work; (2) prepare derivative works; (3) distribute and sell copies of the copyrighted work; (4) perform the copyrighted work; and (5) display the copyrighted work. See 17 U.S.C. § 106(1)–(5). The territorial inquiry thus asks whether conduct infringing any of the asserted rights occurred in the United States. See Spanski, 883 F.3d at 914. If so, "then the case involves a permissible domestic application even if other conduct occurred abroad." Id. at 913 (quoting RJR Nabisco, 579 U.S. at 337). Conversely, if all the "conduct relevant to the [Copyright Act's] focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id. (quoting RJR Nabisco, 579 U.S. at 337).

What must be demonstrated to satisfy the domestic-conduct element depends on which § 106 right (or bundle of rights) was allegedly violated, as each protects against a different kind of conduct. Spanski, for instance, analyzed the public-performance right under § 106(4). A performance occurs, the D.C. Circuit reasoned, wherever the performance is "show[n]." Id. at

914 (quoting 17 U.S.C. § 101). So although the defendant uploaded and transmitted episodes of a copyrighted show from Poland, the infringing performances—and resulting violation of the plaintiff's copyrights—occurred in the United States, where the episodes appeared on viewers' computer screens. Id. at 915. The copyright claim thus involved domestic infringement.

Tripscout contends that the D.C. Circuit retreated from Spanski in IMAPizza. Def.'s MSJ at 5–6. Not so. IMAPizza simply applied Spanski's right-specific inquiry to a different exclusive right. The sole right at issue there was the reproduction right under § 106(1), so the court looked to "where the copy was made." 965 F.3d at 877. Because the copyright owner did not allege that the U.K.-based defendants uploaded or downloaded the copyrighted photos in the United States, he failed to plead any domestic act of infringement. Id. at 877–79. In sum, the decisions are not in tension. Rather, they reflect the same principle applied to different rights: Spanski located a performance, while IMAPizza located a reproduction.

Steinars contends that Tripscout infringed many of the rights enshrined in § 106. See TAC ¶ 212 (alleging that Tripscout "improperly and illegally copied, reproduced, distributed, and publicly displayed" her copyrighted works). To survive summary judgment, however, she need only show that Tripscout violated one of these rights domestically. See 17 U.S.C. § 501(a) ("Anyone who violates *any* of the exclusive rights of the copyright owner [listed in § 106] . . . is an infringer of the copyright." (emphasis added)).

The heart of the suit, according to Steinars, is that Tripscout "displayed" her copyrighted photos and videos to millions of people without a license to do so. Pl.'s MSJ at 1, 15. Put another way, Tripscout violated her exclusive right "to display the copyrighted work[s] publicly." 17 U.S.C. § 106(5). A work is "display[ed]" wherever it is "show[n]" to the public. 17 U.S.C. § 101. The display right's core—a showing—is identical to that of the performance

right under § 106(4) that was analyzed in Spanski.[1] The Court therefore tracks Spanski's reasoning and asks the same preliminary question: Did the copyrighted works appear on viewers' screens in the United States? 884 F.3d at 914. The answer is undisputedly yes. See Pl.'s Waliszewski Tr. 14:6–20, 29:20–32:8, 135:3–12 (explaining that U.S.-based Tripscout staff review posts and removed Steinars' content from Tripscout's pages); ECF No. 91–13, Pl.'s MSJ, Vera Ex. 1 at 8–10 (showing that Tripscout's largest share of viewers is located in the United States).

Tripscout is correct that the domestic-conduct requirement is not automatically satisfied whenever "photons of light have hit computer screens in the United States." Def.'s MSJ at 5. An American merely being able to "access" the infringed work online cannot, standing alone, be equated with homegrown infringement. IMAPizza, LLC v. At Pizza Ltd., 334 F. Supp. 3d 95, 118 (D.D.C. 2018). Nor can it be the case that the domestic-act requirement is satisfied every time an American merely "stumble[s] upon" something uploaded online by a casual foreign user. Spanski, 884 F.3d at 916. That would render the extraterritoriality limits of the Copyright Act meaningless. See 7 Patry on Copyright § 25:86.20 (Sept. 2026 update). Courts therefore require "some 'plus' factor beyond the mere accessibility of the copyrighted property on the internet." State St. Glob. Advisors Tr. Co. v. Visbal, 431 F. Supp. 3d 322, 340 (S.D.N.Y. 2020). In Spanski, for instance, the foreign broadcaster "direct[ed] infringing performances into the United States" by "deliberately remov[ing] geoblocking" protection from certain episodes. 884 F.3d at 916–17. A sufficient link likewise exists where (1) the foreign acts were "intended to, and do,

[1] To "perform" a work "means . . . to *show* its images in any sequence or to make the sounds accompanying it audible," while to "display" a work "means to *show* a copy of it, . . . or, in the case of a motion picture or other audiovisual work, to *show* individual images nonsequentially." 17 U.S.C. § 101 (emphasis added)

have an effect within the United States;" or (2) copyrighted materials were uploaded to U.S. servers. Visbal, 431 F. Supp. 3d at 340 (collecting cases).

Here, American viewers did not see copies of Steinars' content by mere happenstance on an obscure, foreign website. Hundreds of millions of Americans use Instagram and TikTok, and the largest share of Tripscout's audience on Instagram is in the United States. See Pl.'s MSJ, Vera Ex. 1 at 8–10; Pl.'s MSJ at 12 n.18. From this alone, a jury can conclude that Tripscout targeted American users, which is more than enough to satisfy the domestic-act requirement. See, e.g., Spanski, 884 F.3d at 916 ("[A] foreign broadcaster that, as here, directs infringing performances into the United States from abroad commits a domestic violation of the Copyright Act."); Shropshire v. Canning, 809 F. Supp. 2d 1139, 1146 (N.D. Cal. 2011) (finding domestic infringement where a YouTube video uploaded from Canada was viewed by "potentially thousands in the United States").

Resisting this conclusion, Tripscout emphasizes that the infringing posts found on its various accounts were uploaded by overseas contractors. See Def.'s MSJ at 3–6. Perhaps. But that is beside the point. Whether the "infringement began abroad" is irrelevant because it "culminated here in the United States." Crunchyroll, Inc. v. Pledge, No. 11-cv-2334 (SBA), 2014 WL 1347492, at *17 (N.D. Cal. Mar. 31, 2014). To reiterate, Steinars need show only one "act of 'domestic infringement'" to overcome summary judgment. IMAPizza, 965 F.3d at 876. And because some conduct "relevant to the statute's focus occurred in the United States"— namely, Tripscout's display of Steinars' copyrighted materials to an American audience—this case "'involves a permissible domestic application' of the Copyright Act, 'even if other conduct occurred abroad.'" Spanski, 883 F.3d at 914 (quoting RJR Nabisco, 579 U.S. at 337).

In a sense, Tripscout tries to repackage an argument the D.C. Circuit swiftly rejected in Spanski. There, the Poland-based broadcaster contended it was shielded from liability for transmitting copyrighted work to American audiences because the transmission was initiated abroad. Spanski, 883 F.3d at 914–15. "Given the ease of transnational internet transmissions," the D.C. Circuit reasoned, "a statutory scheme that affords copyright holders no protection from such broadcasters would leave the door open to widespread infringement, rendering copyright in works capable of online transmission largely nugatory . . . . Congress could not have intended the [rights enshrined in § 106] to be susceptible to such ready evasion." Id. at 915. That logic applies with equal force here. Tripscout cannot fill its U.S.-facing social media pages with another creator's copyrighted work, have international contractors press "post," and then wash its hands of the consequences. As another court recently explained:

> Defendants' argument—that by using a foreign contractor to choose photographs to include in a website directed at United States consumers, a United States based company can avoid liability under the Copyright Act—teeters on the line of frivolity, if it does not cross it. These U.S.-based defendants cannot escape liability under the Copyright Act by offshoring part of their production process. To hold otherwise would profoundly undermine the protection of the Copyright Act in the United States.

Michael Grecco Prods., Inc. v. Valuewalk, LLC, 345 F. Supp. 3d 482, 499 (S.D.N.Y. 2018).

Steinars is not out of the woods yet, however. Although this case involves native infringement, her road to trial has three more potential roadblocks: (1) liability; (2) Tripscout's affirmative defenses; and (3) damages.

B. Direct Copyright Infringement

Defendants may be found liable of copyright infringement either directly, contributorily, or vicariously. In Lux Rsch. v. Hull McGuire PC, No. 23-cv-523 (JEB), 2023 WL 6121906, at *5, *9 (D.D.C. Sept. 19, 2023). Direct liability attaches to the entity that "actually did the infringing." Strike 3 Holdings, LLC v. Doe, 964 F.3d 1203, 1211 (D.C. Cir. 2020) (citation

omitted). In contrast, "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Groksters, 545 U.S. 913, 930 (2005) (citations omitted). Steinars proceeds via the direct-infringement route only. Pl.'s MSJ at 4; ECF No. 99, Pl.'s Reply in Supp. of Cross Mot. for Partial Summ. J. ("Pl.'s Reply") at 7.

To prevail on a direct infringement claim, a plaintiff must establish: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see IMAPizza, 965 F.3d at 876. Tripscout urges the Court to also recognize an implicit causation element—referred to by other courts as the volitional-act requirement—and argues that summary judgment in its favor is warranted because Steinars has not satisfied her burden on any of the elements. Def.'s MSJ at 6–8, 15–17. Steinars counters that she is entitled to summary judgment on the issue of liability because (1) she owns valid copyrights in all the infringed works; (2) Tripscout copied protected elements from those works; and (3) to the extent there is an implicit causation element, it is undisputed that Tripscout undertook a volitional act. See Pl.'s MSJ at 4–7, 15–20. The Court addresses these elements in turn.

*1. Ownership of Valid Copyright*

A certificate of copyright registration made "within five years after first publication of the work" constitutes "prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c). Steinars produced timely certificates for all 41 works she claims were infringed. See Pl.'s MSJ at 5, 28; Pl.'s MSJ, Registration Certificates, Exs. 2(a)–(c). The burden thus shifts to Tripscout to demonstrate the invalidity of those copyrights. MOB Music Pub. v. Zanzibar on the

Waterfront, LLC, 698 F. Supp. 2d 197, 202 (D.D.C. 2010). Tripscout tries to carry that burden by contending that Steinars improperly identified herself as the author on the registrations. According to Tripscout, Steinars' husband, Leo, is the true author of the works for which he operated the camera. Alternatively, Tripscout argues that Katla Creative, the business Steinars owns and operates, must be deemed the author of all 41 works under the work-for-hire doctrine. See Def.'s MSJ at 15–17; ECF No. 95, Def.'s Opp. to Pl.'s MSJ & Reply ("Def.'s Reply") at 13–17. Neither theory finds support in the record. And even assuming Steinars penciled in incorrect authorship information on the registration applications, inadvertent mistakes, standing alone, do not invalidate otherwise valid copyright certificates.

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). Initial ownership vests "in the author or authors of the work," id. § 201(a), and "[a]s a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection," Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989). A work is "fixed" "when its embodiment in a copy . . . , by or *under the authority of the author*, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101 (emphasis added).

Authors are generally "entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public." Andrien v. S. Ocean Cnty. Chamber of Com., 927 F.2d 132, 135 (3d Cir. 1991). Photographs specifically "may receive copyright protection in 'so far as they are representatives

of original intellectual conceptions of the author.'" Lindsay v. Wrecked and Abandoned Vessel R.M.S. Titanic, No. 97-cv-9248 (HB), 1999 WL 816163, at *4 (S.D.N.Y. Oct. 13, 1999) (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884)). Elements of originality may include posing subjects, lighting, timing, focus, and angle. See Harney v. Sony Pictures Television, 704 F.3d 173, 180–81 (1st Cir. 2013); Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992).

Tripscout says Infringement Nos. 2–5, 7–15, 17–38, 40–45, and 47–53 involve works in which Steinars is the subject and therefore not the author. Def.'s MSJ at 16. But this theory, which focuses solely on who physically snapped the photo or hit the record button, ignores the creative control Steinars insists she always exercised. Steinars says she is "solely responsible" for all creative and final editing decisions for her content. Pl.'s MSJ at 25; see also Pl.'s SUMF ¶¶ 12–17. When Steinars is in the shot, Leo's contribution is "limited" to "handling camera and drone equipment . . . at [his] wife's direction," ECF No. 91–11, Leo Decl. ¶¶ 5–6, while Steinars dictates everything else, including the subject matter, timing, camera angle, lighting, perspective, lens, and equipment used, see Steinars Decl. ¶¶ 14–18, 20. Although Tripscout disputes this, arguing that Leo "necessarily undertook a multitude of creative contributions in capturing the resultant images and/or videos," Def.'s Reply at 14, it points to no record evidence supporting its claim. Such "speculation is not enough to survive summary judgment." Atanus v. Sebelius, 652 F. Supp. 2d 4, 10 (D.D.C. 2009).

Even assuming Leo's role as the cameraman made him the author of the works underlying Infringement Nos. 2–5, 7–15, 17–38, 40–45, and 47–53, Steinars naming herself as the sole author on the copyright applications for those works does not automatically invalidate the resulting registrations. Under the Copyright Act's safe-harbor provision, a certificate of

registration remains prima facie evidence of a valid copyright—"regardless of whether the certificate contains any inaccurate information"—unless: "(A) the inaccurate information was included on the application for copyright registration with *knowledge* that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1) (emphasis added).

"Lack of knowledge of either fact *or law*," as the Supreme Court recently explained, "can excuse an inaccuracy in a copyright registration." Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 595 U.S. 178, 182 (2022) (emphasis added); see also Real World Media LLC., 744 F. Supp. 3d 24, 34 (D.D.C. 2024) (explaining that the knowledge element requires "actual, subjective awareness of both the facts and the law"). Here, there may be a genuine dispute of fact about mistake-of-fact knowledge: By Steinars' own admissions, she knew that Leo assisted her with capturing some of the copyrighted works. Pl.'s Resp. ¶ 12. But that only gets Tripscout halfway home, as Steinars knowing that her husband was the cameraman for some of the works is not the same as knowing that naming herself as the author for those works was legally inaccurate. Critically, Tripscout does not even argue that Steinars knew her claim to sole authorship was legally questionable, nor does it point to anything in the record suggesting Steinars knew that the applications for the contested works "failed to comply with the requisite legal requirements." Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 52 F.4th 1054, 1067 (9th Cir. 2022). Because we are left with only "metaphysical doubt" as to whether Steinars actually knew that the information submitted to the Copyright Office was legally suspect (even if it were), Tripscout has failed to meet its burden. Matsushita, 475 U.S. at 586.

Finally, Tripscout argues that the registered works were "'works for hire' because they were run through Plaintiff's business Katla Creative." Def.'s MSJ at 16 n.5. Under the work-

for-hire doctrine, the employer for whom the work was made, rather the employee who created the work, is generally deemed the author. 17 U.S.C. § 201(b); see Staggers v. Real Authentic Sound, 77 F. Supp. 2d 57, 64 (D.D.C. 1999). To determine whether a hired party is an employee, the Court must turn to the common law of agency and "consider the hiring party's right to control the manner and means by which the product is accomplished." Reid, 490 U.S. at 751 (listing factors for agency analysis). Relevant factors include "the hired party's discretion over when and how long to work," id., and if the work was "actuated . . . by a purpose to serve the master," Roeslin v. District of Columbia, 921 F. Supp. 793, 798 (D.D.C. 1995).

Tripscout's only evidence in support of an agency relationship is Steinars receiving a salary from Katla Creative. Def.'s Reply at 17. That is not enough to raise a genuine dispute of material fact. For one, Tripscout does not deny that Katla Creative exercises no creative control over Steinars' works. Id.; see Steinars Decl. ¶¶ 22–23. Nor does it cite any evidence that suggests the copyrighted works were made at the request of Katla Creative or otherwise calls into question Steinars' ability "to control the manner and means by which" her content is made. Reid, 490 U.S. at 751. For another, the work-for-hire exception does not apply where, as here, the creator is also the company's founder, owner, or president—even if the company pays the creator a salary. See, e.g., Aquarian Found., Inc. v. Lowndes, 127 F.4th 814, 820–21 (9th Cir. 2025); Jules Jordan Video, Inc. v. 144942 Canada Inc., 617 F.3d 1146, 1155–56 (9th Cir. 2010); M & A Assocs. v. VCX, Inc., 657 F. Supp. 454, 459–60 (E.D. Mich. 1987).

"Perhaps more importantly, even if the [photos and videos] were works for hire," Steinars incorrectly listing herself as the author—rather than Katla Creative—"does not constitute a basis to invalidate the copyright" unless she intended to defraud the Copyright Office. Jules Jordan Video, 617 F.3d at 1156. Again, supplying inaccurate information in a registration application

does not by itself invalidate a copyright, and Tripscout has again failed to show that any mistake regarding authorship, even if there were one, was intentional rather than inadvertent.

### 2. *Copying*

Moving to the next element, Steinars may prove copying by demonstrating (1) Tripscout had access to her copyrighted works and (2) substantial similarity between the protected material in her works and Tripscout's works. Prunte v. Universal Music Grp., 484 F. Supp. 2d 32, 40–41 (D.D.C. 2007). Tripscout neither disputes nor denies either prong for Infringement Nos. 1–8 and 10–53. Indeed, Tripscout admits it lifted the underlying photos and videos from Steinars' Instagram account. See Def.'s SUMF ¶ 24. And it concedes "it did not make any changes to the Copyrighted Works" before posting them on its undisputed accounts. ECF No. 73–2, Def.'s Answers to Pl.'s First Set of Interrogatories at 7, 30–32. When, as here, "duplication is literal or verbatim, then clearly substantial similarity exists." Bell v. Wilmott Storage Servs., 12 F.4th 1065, 1074 (9th Cir. 2021) (quoting 4 Nimmer on Copyright § 13.03[A][1] (2019)); see also 4 Nimmer on Copyright § 13D.04 (2026) (noting that the "most obvious" example of direct evidence of copying is "defendant's admission that he copied").

Tripscout does push back on Infringement No. 9, which occurred on the @antarcticaexplores Instagram account. Tripscout argues it is entitled to summary judgment on this infringement because it has never owned or been associated with that account. Def.'s MSJ at 8. Tripscout's CEO swore to it. ECF No. 89–4, Def.'s MSJ, Ex. B, Waliszewski Decl. ¶¶ 3–13. And the company claims to have tracked down the real owner of the imposter account—an unaffiliated Instagram user named "prakarti88." Id. ¶ 6; Def.'s SUMF ¶ 7.

A jury might well side with Tripscout on this issue. But it could also conclude that Tripscout owned, operated, or controlled the disputed account from a constellation of facts.

First, the name of the account is very similar to the names of Tripscout's undisputed accounts. See ECF No. 91–14, Pl.'s MSJ, Vera Decl. Ex. 2 at 4–12 (listing Tripscout's accounts, including @italyexplores, @norway.explores, @mexico.explores, @morroccoexplores, and @croatiaexplores). Second, Tripscout instructs its staff to reach out to creators on Instagram using a template paragraph, where the worker need only fill in their name and the creator's name. See ECF No. 99–4, Pl.'s Reply, Vera Ex. 1 ("Instagram Playbook") at 1. Steinars has received many of these cookie-cutter DMs from Tripscout's undisputed accounts, including one from an employee named "Rita." ECF No. 91–9, Pl.'s MSJ, Ex. 5 at 2–14, 18. The @antarcticaexplores account repeatedly DM'd Steinars using the *same* template message, with the sender also identifying herself as "Rita." Id. at 1, 15–17. Finally, @antarticaexplores, like Tripscout's undisputed accounts, also reposted Steinars' content. See Pl.'s Resp. ¶ 10. In other words, the disputed account had a similar name and engaged in identical outreach and conduct as Tripscout's undisputed accounts. Because this evidence creates a genuine factual dispute, a jury must decide whether Tripscout owned the account.

*3. Volitional Conduct*

Finally, causation. The D.C. Circuit has not yet had to decide whether to read "a volitional conduct or proximate cause" requirement into the Copyright Act. Spanski, 883 F.3d at 912. But every circuit to squarely address this issue has done so. See, e.g., Perfect 10, Inc. v. Giganews, Inc., 847 F.3d 657, 666–67 (9th Cir. 2017); BWP Media USA, Inc. v. T & S Software Assocs., 852 F.3d 436, 440, 444 (5th Cir. 2017); Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 387 (3d Cir. 2016); Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008); CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544, 550 (4th Cir. 2004).

This Court follows suit. Courts presume that statutory causes of action incorporate traditional causation principles unless Congress explicitly provides otherwise. See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 332 (2020); Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 132 (2014). This is especially so when the cause of action resembles a common-law tort. See Bank of Am. Corp. v. City of Miami, 581 U.S. 189, 201 (2017). "Courts have long recognized that infringement of a copyright is a tort." Ted Browne Music Co. v. Fowler, 290 F. 751, 754 (2d Cir. 1923). The volitional-conduct requirement thus stands for the "unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." Giganews, 847 F.3d at 666 (quoting Nimmer on Copyright § 13.08[C][1]). Indeed, although the official "volitional-conduct" label may be absent, proximate causation concerns consistently lurk in the background of copyright opinions from both the Supreme Court and D.C. Circuit. See, e.g., Sony v. Universal City Studios, 464 U.S. 417, 436 (1984) (rejecting the argument that merely "supplying the 'means' to accomplish an infringing activity" is enough to establish liability for copyright); Spanski, 883 F.3d at 916 (recognizing "lack of proximate causation" as a defense against direct liability). Direct liability under the Copyright Act therefore must be premised on conduct that causes the infringement "in some meaningful way." CoStar, 373 F.3d at 549.

This case, however, is different than the canonical volitional-act cases Tripscout cites. Those cases involved direct-liability suits against passive actors—typically internet service providers or website owners—for infringement on their platforms committed by unrelated, third-party users. See Spanski, 883 F.3d at 912 (collecting cases). They rejected liability because there was no "evidence showing the alleged infringer exercised control (other than by general operation of its website or service); selected any material for upload, download, transmission, or

storage; or instigated any copying, storage, or distribution." VHT, Inc. v. Zillow Grp., Inc., 918 F.3d 723, 732 (9th Cir. 2019) (cleaned up). Or as Justice Scalia explained, "[t]he volitional-conduct requirement is not at issue in most direct-infringement cases . . . . But it comes right to the fore when a direct-infringement claim is lodged against a defendant who does nothing more than operate an automated, user-controlled system." Am. Broad. Cos. v. Aereo, Inc., 573 U.S. 431, 454 (2014) (Scalia, J., dissenting).

Tripscout, by contrast, was not a mere "passive conduit for copyrighted material." BWP Media, 852 F.3d at 439. The company not only owned the accounts on which the copyrighted works were posted, Def.'s Resp. ¶ 50, but it also elected to operate those accounts through a mix of employees and independent contractors it hired to perform the *exact* task that led to the repeated infringement of Steinars' work, see id. ¶ 25; Def.'s SUMF ¶ 5. Plus, Tripscout provides its contractors with a detailed "playbook" for how to obtain content from other creators and repost it on Tripscout's accounts. See Pl.'s MSJ, Vera Ex. 1 at 45–60 (telling contractors to "[r]each out to 20 creators/day," what content themes to target, and guidelines for posting); Instagram Playbook at 1–11 (similar). Tripscout's conduct, in other words, caused "in some meaningful way [the] infringement" at issue, which is all Steinars must show to satisfy the volitional-conduct requirement. CoStar, 373 F.3d at 549.

Resisting this conclusion, Tripscout contends that it "did not post the content at issue"—it instead "used a network of independent contractors to manage and post content on its social media handles." Def.'s Reply at 5. In essence, Tripscout thinks it cannot be held directly liable for infringement on its social media pages because its contractors—not its officers, employees, or the corporate entity itself—pressed the post button. The argument is not totally without merit: Asking "who actually presse[d] the button" is useful shorthand for gauging direct liability.

ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 321 (2d Cir. 2022) (quoting Cartoon Network, 536 F.3d at 131). But this turn of phrase is not to be taken literally. Direct-infringement liability, properly understood, may attach to any defendant who commits infringement "either directly *or through an agent*." 6 Patry on Copyright § 21:41 (emphasis added).

Although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," Sony, 464 U.S. at 434, federal statutes must be read in light of their common-law backdrop, Astoria Fed. Sav. & Loan Assn. v. Solimino, 501 U.S. 104, 108 (1991). The common law of agency is particularly relevant when interpreting the Copyright Act, see, e.g., Reid, 490 U.S. at 751–52, and the Restatement of Agency is a "useful beginning point for a discussion of general agency principles," Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 755 (1998). The Restatement explains that a principal (here, Tripscout) is "subject to direct liability" when "the agent acts with actual authority or the principal ratifies the agent's conduct," "the principal is negligent in selecting, supervising, or otherwise controlling the agent," or "the principal delegates performance of a duty to use care to protect other persons or their property to an agent who fails to perform the duty." Restatement (Third) of Agency § 7.03 (2006).

The record leaves no doubt that Tripscout gives its independent contractors actual authority to post on its behalf. "[I]t is undisputed that Tripscout utilizes independent contractors to operate and post to [its] social media accounts." Def.'s MSJ at 7. And Tripscout delegates to those contractors the duty to ensure they do not post copyrighted content without the copyright holders' permission. See id. at 26; Def.'s Resp. ¶ 46; Pl.'s MSJ, Vera Ex. 1 at 45–47, 62–65; Instagram Playbook at 1–11. Plus, its employees and CEO often review the contractors' posts. See Pl.'s Waliszewski Tr. 29:20–32:9. Therefore, under black-letter agency principles, Tripscout can be sued for direct infringement when, as here, its contractors post unauthorized content on its

pages. See Def.'s SUMF ¶ 5 ("All of the social media accounts at issue in this case for which Tripscout is the registered user are operated by independent contractors located in Egypt. All of the alleged infringements . . . were posted by independent contractors in Egypt.").

Case law and common sense confirm this understanding. A corporation can *only* act through its officers, employees, and agents. See Columbia Plaza Corp. v. Sec. Nat. Bank, 676 F.2d 780, 786 (D.C. Cir. 1982). So it is no wonder that courts, including the D.C. Circuit, have repeatedly held businesses directly liable for infringements committed by employees, contractors, and other agents. See, e.g., Stenograph L.L.C. v. Bossard Assocs., 144 F.3d 96, 101 (D.C. Cir. 1998); Spanski, 883 F.3d at 908, 916; Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 56–58 (1st Cir. 2012); RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co., 845 F.2d 773, 781–82 (8th Cir. 1988). Indeed, the reason the D.C. Circuit concluded in Spanski that it "need not" determine whether to read a volitional-act requirement into the Copyright Act was because it treated the conduct of TV Polska's employees—transmitting copyrighted content to U.S. viewers—as "TV Polska's conduct." 883 F.3d at 912. And, as a final blow to Tripscout's argument, courts have repeatedly found businesses directly liable for copyright infringement in situations nearly identical to this one: where the corporation owns the Instagram page or website and its independent contractor posted the infringing photo. See, e.g., Shihab v. Source Digital, Inc., No. 23-cv-7266 (DLC), 2024 WL 3461351, at *2–3 (S.D.N.Y. July 18, 2024); Monroe v. NorthStar Source Grp., LLC, No. 23-cv-6220 (DEH), 2025 WL 1939027, at *2, *4 (S.D.N.Y. July 15, 2025) (same).

In the end, while Tripscout is correct that there must be some causal nexus between its conduct and the infringement, undisputed record facts show that the volitional-conduct requirement is satisfied here. Tripscout's position that it can showcase copyrighted content and

"simultaneously insulate itself from liability simply by contracting out the operation of all its" social media pages to independent contractors "and burying its head in the sand" cannot be squared with the Copyright Act's text, Congress's intent, the case law, or common sense. Cf. Montanez v. Price, 154 F.4th 127, 151 (3d Cir. 2025) (Krause, J.) (holding that a state can be sued directly for violations of the Americans with Disability Act committed by its independent contractors), cert. denied, 2026 WL 1718015 (U.S. June 15, 2026).

* * *

To recap, Steinars is entitled to partial summary judgment on the issue of liability for the infringements on the undisputed accounts—Infringement Nos. 1–8 and 10–53. Tripscout's motion for summary judgment with respect to Infringement No. 9 is denied, as there is a material dispute of fact regarding who owns the @antarcticaexplores Instagram account.

With that, Steinars may have won the liability battle, but that does not end the summary-judgment war. Tripscout additionally maintains that two of its affirmative defenses defeat Steinars' claims as a matter of law and that, in any event, Steinars cannot establish damages.

C. Affirmative Defenses

Tripscout seeks summary judgment on two affirmative defenses: licenses and limitations. See Def.'s MSJ at 9–15, 26–29. In doing so, it largely rehashes arguments the Court rejected at the motion-to-dismiss stage. Nothing in the developed record compels a different result.

*1. Explicit or Implicit License*

For a copyright infringement claim to succeed, "[t]he copying must be beyond the scope of a license possessed by the defendant." Stenograph, 144 F.3d at 99. Licenses may be explicit or implicit, and the burden is on the defendant to show that a license exists. See Atkins v. Fischer, 331 F.3d 988, 992–93 (D.C. Cir. 2003).

Tripscout first contends that Instagram's Terms of Use and Privacy Policy granted it an explicit license to copy Steinars' works. Def.'s MSJ at 26–28. That is wrong. Instagram's Terms of Use grant *Instagram*—not other Instagram users—a license over works posted on the platform. Steinars I, 2024 WL 1532587, at *4. Because Tripscout has not shown that Instagram granted it a sublicense covering its use of Steinars' copyrighted works, Instagram's Terms of Use do not shield it from liability. See, e.g., McGucken v. Newsweek LLC, 464 F. Supp. 3d 594, 603 (S.D.N.Y. 2020); Sinclair v. Ziff Davis, LLC, No. 18-cv-790 (KMW), 2020 WL 3450136, at *1 (S.D.N.Y. June 24, 2020). The Privacy Policy, on the other hand, grants Instagram users the ability to "send public content" via Instagram's built-in sharing mechanisms, such as DMs or stories. Steinars II, 2025 WL 485415, at *5 ("Instagram would have been clear if it wanted to grant all users the right to copy any public post. But it used the more limited language of 'send' instead."). Tripscout did not merely "send" Steinars' posts—it downloaded works from Steinars' Instagram page and reuploaded them on its various social media pages. Tripscout's explicit-license theory thus still "fails as a matter of law." Id.; see *How to Make Sure Content You Post to Instagram or Threads Doesn't Violate Copyright Law*, META, https://www.facebook.com/help/instagram/354736791367645/ [https://perma.cc/HFN6-HD6W] (last accessed Aug. 31, 2026) (explaining that posting other users' content may infringe a copyright and advising users to obtain express permission or a license before doing so).

Tripscout's implied-license defense falls flat as well. To show that an implicit license was granted, Tripscout must show that (1) it requested the creation of a work; (2) Steinars created and delivered that work to Tripscout; and (3) Steinars intended that Tripscout copy and distribute her work. Atkins, 331 F.3d at 991–92. The circumstances in which an implied license may be found are therefore quite "narrow." SmithKline Beecham Consumer Healthcare v.

Watson Pharm., 211 F.3d 21, 25 (2d Cir. 2000) (citation omitted). Tripscout does not grapple with these elements. Instead, it argues licenses can also be implied via silence or "failure to object . . . if there are other factors about the parties' relationship supporting such a license." Def.'s MSJ at 28–29 & n.10 (citing Baisden v. I'm Ready Productions, Inc., 693 F.3d 491, 500–501 (5th Cir. 2012)). But we are in the D.C. Circuit, not the Fifth. Here, "mere acquiescence . . . is insufficient to create an implied license." Letsch v. S. Proper Hosp. Grp., LLC, No. 21-cv-1840 (TJK), 2025 WL 823892, at *7 (D.D.C. Mar. 14, 2025) (cleaned up). So Tripscout's implied-license defense fails under binding precedent. See Atkins, 331 F.3d at 991–92.

In any event, even those courts that do not follow the D.C. Circuit's three-part test still require evidence of a meeting of the minds between the licensor and licensee such that it is fair to infer that the licensor intended to grant the license. See Baisden, 693 F.3d at 501–02; Associated Press v. Meltwater U.S. Holdings, Inc., 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013) ("Since an implied license is a creature of contract law, the parties' intent is a critical factor."). Tripscout thinks Steinars' positive engagement with social media accounts associated with Tripscout—specifically, her reacting with ❤️ to a few of their DMs—shows that Steinars gave it a license to copy. Def.'s MSJ at 29; Def.'s MSJ, Ex. H at 4, 6–7. But there is a material dispute of fact on this point: Steinars testified that she did not view heart-reaction emojis or her other interactions with Tripscout via DM as having had any license-granting meaning. See Pl.'s MSJ at 36–37; Pl.'s Resp. ¶ 23; Steinars Decl. ¶¶ 47–48. Tripscout also argues that Steinars sent DMs "approving of and encouraging the sharing of her publicly posted content" on two separate occasions. Def.'s MSJ at 29; see Def.'s MSJ, Ex. H at 2, 8. But the accounts to which Steinars purportedly gave consent are either not at issue in this case or were not owned by Tripscout at the time of the interaction. See Steinars Decl. ¶¶ 51–54. More fundamentally, permitting one

account to repost one photograph on one occasion does not give Tripscout's hundreds of other accounts a perpetual license to republish Steinars' content with impunity. Accordingly, Tripscout is not entitled to summary judgment on this affirmative defense.

*2. Statute of Limitations*

Actions under the Copyright Act must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). A claim accrues when the copyright holder discovers, or with due diligence should have discovered, the infringement. Tech 7 Sys., Inc. v. Vacation Acquisition, Inc., 594 F. Supp. 2d 76, 83 (D.D.C. 2009). Tripscout asserts that Infringement Nos. 8, 10, 12, 18, 31, 34, 35, 39, 46, and 47 are time barred because Steinars filed them outside of the three-year limitations window. Def.'s MSJ at 9–10. It is mistaken twice-over.

First, most of these Infringements were timely filed even under Tripscout's timeline of events. Tripscout concedes that Infringement Nos. 8, 10, 12, 18, 31, 34, 35, and 39 were discovered on December 29, 2020, and contends Steinars first asserted them in her Second Amended Complaint. Def.'s Infringement Table at 3–4, 6–7. The day on which Steinars moved for leave to file that complaint, December 19, 2023,[2] is the operative date for assessing timeliness. So these claims were filed within the three-year limitations period. Tripscout's position that the Court should count back from January 3, 2024—the day Steinars' motion was *granted*—is wrong. See Moore v. Indiana, 999 F.2d 1125, 1131 (7th Cir. 1993) ("[T]he submission of a motion for leave to amend, properly accompanied by the proposed amended complaint that provides notice of the substance of those amendments, tolls the statute of limitations, even though technically the amended complaint will not be filed until the court rules on the motion."); Mayes v. AT & T Info. Sys., Inc., 867 F.2d 1172, 1173 (8th Cir. 1989)

[2] See ECF No. 18, Pl.'s Mot. for Leave to Amend Compl. at 1.

(concluding that an "amended complaint is deemed filed within the limitations period" when a motion for leave to amend is filed before the expiration of the statute of limitations but the entry of the court order and the filing of the amended complaint occur after the limitations period has expired); see, e.g., Cabrera v. Black & Veatch Special Project Corp., No. 19-cv-3833 (LLA), 2024 WL 1435146, at *5 (D.D.C. Mar. 28, 2024) ("[T]he date Plaintiffs moved for leave to file a Second Amended Complaint is the operative date when assessing the statute of limitations.").

Second, and more importantly, Infringement Nos. 8, 10, 12, 18, 31, 34, 35, 39, 46, and 47 are timely under the relation-back rule. An amended complaint relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "As Tripscout [again] acknowledges, the initial complaint appended all of the alleged instances of infringement that Tripscout claims are time barred and was filed within three years of each alleged date of discovery." Steinars I, 2024 WL 1532587, at *3; see Def.'s Infringement Table at 3–4, 6–8. These works were also attached as exhibits to the First and Second Amended Complaints. See ECF No. 7, FAC, Exs. 1–4; SAC, Exs. 1–3. Tripscout can hardly claim surprise from claims the pleadings have foreshadowed from the outset. See Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 866 (D.C. Cir. 2008) (claim relates back if "the original complaint adequately notified the defendant[] of the basis for liability the plaintiff[] would later advance in the amended complaint"). Finally, as the Court has already explained, infringements that were crystalized in later iterations of the complaint "clearly arise[] out of the same conduct alleged in the original complaint, that is, unlicensed usage of Steinars' copyrighted material." Steinars I, 2024 WL 1532587, at *3; see also Iconics, Inc. v. Massaro, No. 11-cv-11526 (DPW), 2016 WL 199407, at *5 (D. Mass. Jan. 15, 2016) (concluding that "copyright infringement

claims . . . clearly relate back to the original filing . . . even if the specific copyrights in question changed from one version of the complaint to the next" when the new claims involve similar "infringing events" and amendment was spurred by plaintiff "discover[ing] that the infringement was more substantial than it originally realized"). All of Steinars' infringement claims thus fall within the statute of limitations.

Now that Steinars has cleared the extraterritoriality, liability, and affirmative-defense hurdles, only the issue of damages stands between her and a jury.

D. Damages

The Copyright Act provides two paths for monetary relief. See 17 U.S.C. § 504(a). Section 504(b) allows a copyright owner "to recover [1] the actual damages suffered by . . . her as a result of the infringement, and [2] any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Said differently, § 504(b) allows the copyright holder to both recoup her own losses *and* disgorge the infringer of any ill-gotten gains. See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 707–08 (9th Cir. 2004); accord Lerch Bates, Inc. v. Michael Blades & Assocs., No. 20-cv-2223 (BAH), 2023 WL 6276643, at *13 (D.D.C. Sept. 26, 2023) ("The Copyright Act aims to both compensate for the injury resulting from infringement and to strip the infringer of the profits generated from infringement, in order to make clear that there is no gain to be made from taking someone else's intellectual property without their consent." (cleaned up)). Section 504(c), on the other hand, authorizes statutory damages within a defined range of $200 to $150,000 per infringement, depending on the infringer's mens rea.

A copyright owner gets to choose which remedy they want at any point before final judgment is entered. See 17 U.S.C. § 504(c)(1); Petrella v. Metro-Goldwyn-Mayer, Inc., 572

U.S. 663, 669 (2014). Steinars, unsurprisingly, says she will pick "whichever is larger." TAC at 22. Tripscout, however, contends that Steinars is not entitled to actual damages for any of the infringements as a matter of law and is barred from recovering statutory damages for most of them. See Def.'s MSJ at 17–18; Def.'s Reply at 17–18.

*1. Actual Damages*

The Copyright Act entitles a copyright owner to recover "the actual damages suffered by . . . her as a result of the infringement." 17 U.S.C. § 504(b). Although the statute does not define "actual damages," the term is "broadly construed to favor victims of infringement." On Davis v. The Gap, Inc., 246 F.3d 152, 164 (2d Cir. 2001) (collecting cases). Courts have coalesced around two measures of actual damages. The first is the profits the copyright holder lost because of the infringement, such as through lost sales of her own work. Dash v. Mayweather, 731 F.3d 303, 312 (4th Cir. 2013). The second is "the fair market value of a license covering the defendant's infringing use." On Davis, 246 F.3d at 172. Under either theory, a copyright holder must "prove the existence of a causal connection between the alleged infringement and some loss of anticipated revenue." Thoroughbred Software Int'l, Inc. v. Dice Corp., 488 F.3d 352, 358 (6th Cir. 2007). And while some speculation is inherent in calculating actual damages, summary judgment is warranted for the defendant if the factfinder would have to resort to "undue speculation" in estimating actual damages. On Davis, 246 F.3d at 166.

Steinars advances both theories of actual damages: lost sales and lost license fees. But the record provides sufficient support only for a lost-license theory.

a. Lost Sales

Under a lost-sales theory, the copyright owner must show that (1) she lost profit after the infringement and (2) the infringement caused the lost profit. See Dash, 731 F.3d at 312–13.

Steinars' lost-sales theory is straightforward. She makes money by attracting users to her Instagram page, where she earns commission on tour and hotel bookings made through links on her profile. More user traffic means more opportunities to earn commission. She contends that Tripscout's reposting of her copyrighted works diverted users from her page, reducing both user traffic on her page and commission revenue she otherwise would have earned. See Pl.'s Resp. ¶¶ 14, 19; Steinars' Interrogatories at 4.

But there is nothing in the record to support this theory, such as evidence of decreased user traffic, lost sales, or lost revenue. To the contrary, Steinars' follower count *grew* from 47,000 when Tripscout first began sharing her posts to 434,000 when Steinars contacted the company regarding the unauthorized display of her content. Pl.'s Resp. ¶¶ 15–16. Steinars' exponential follower growth during this relatively short span strongly suggests, if anything, that Tripscout's unauthorized use of her work *drove* users to her page, thereby *increasing* her profits from commission and promoting products. Tellingly, Steinars provides no evidence of the commission she earned from bookings before, during, or after the infringements occurred. See Hamil Am. Inc. v. GFI, 193 F.3d 92, 108 (2d Cir. 1999) ("In the absence of convincing evidence as to the volume of sales that plaintiff would have obtained but for the infringement, the measure of lost profits may be rejected as too speculative." (quoting Nimmer on Copyright § 14.02[A])).

Steinars fares no better on the causation element. Even if she had shown a post-infringement sales decline, that alone would not have been enough to survive summary judgment because a plaintiff must also show that the infringement *caused* the decline. See Taylor v. Meirick, 712 F.2d 1112, 1120 (7th Cir. 1983) (Posner, J.); Odegard, Inc. v. Costikyan Classic Carpets, Inc., 963 F. Supp. 1328, 1340 (S.D.N.Y. 1997) ("When seeking an award of damages for lost sales, the burden is on the plaintiff to demonstrate that it would have made the sales but

for the infringing activity.”). Yet Steinars provides no evidence from which a jury could reasonably infer causation, such as pre- versus post-infringement sales trends, sales to common customers, proof of customers switching, evidence of lost market share, or any expert evidence. That dooms her lost-sales theory of damages.

b. Lost Licenses

Steinars’ lost-license theory fares better. “Although ‘actual damages’ can be awarded in the form of lost profits, hypothetical-license damages also constitute an acceptable form of ‘actual damages’ recoverable under Section 504(b).” Oracle Corp. v. SAP AG, 765 F.3d 1081, 1087 (9th Cir. 2014). Under a hypothetical-license theory, actual damages are based on “what a willing buyer would have been reasonably required to pay to a willing seller for [the] plaintiff’s work.” Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 512 (9th Cir. 1985). To survive summary judgment, a plaintiff must offer evidence from which a reasonable jury could estimate, without undue speculation, the fair-market value of the use the defendant appropriated. See Dash, 731 F.3d at 313, 317–19. That does not require a historical twin—in other words, a prior license matching the hypothetical one in every respect. See Jarvis v. K2 Inc., 486 F.3d 526, 533–35 (9th Cir. 2007); On Davis, 246 F.3d at 161, 166–67. Still, the plaintiff needs some objective basis for valuing the use, such as prior licensing arrangements or sales. A mere subjective estimate of what the plaintiff could have charged, without any hard proof, is therefore not enough. See, e.g., Dash, 731 F.3d at 317 (affirming summary judgment for defendant where plaintiff “failed to present any evidence—such as an affidavit or a prior contract—that he had ever sold, offered for sale, or licensed one of his [works to defendant] or anyone else”); Bell v. Taylor, 827 F.3d 699, 709 (7th Cir. 2016) (similar).

Tripscout contends that Steinars failed to provide concrete evidence supporting the objective fair-market value of a license for her works. Def.'s Reply at 20–22. It is mistaken. Steinars produced a panoply of invoices from which a reasonable jury could determine, without undue speculation, the fair-market value of the hypothetical licenses for the infringed works in this case. See ECF 91–10, Pl.'s MSJ, Ex. 6 ("Invoices") at 1–12.

Between 2020 and 2025, companies paid Steinars handsomely to create, post, and license content—typically promotional videos or photos. See id.; Def.'s Reply 22. In late 2022, for instance, an outdoor-clothing brand and a camping-gear company each paid Steinars €7,000 to post on Instagram a photo featuring their products and to license the resulting content. See Invoices at 6–7; ECF No. 89–6, Def.'s MSJ, Ex. D ("Steinars Tr.") 403:19–406:3; 407:13–408:16. In mid-2023, another company paid Steinars €3,000 to license images of her camping that she would have otherwise posted on her Instagram account. Invoices at 5; Steinars Tr. 399:16–401:9. Around that same time, Icelandair paid Steinars €25,700 to create ten photos and a handful of videos that the airline could use in advertisements and promotional materials posted on YouTube, TikTok, and Instagram. Invoices at 10–11. Importantly, the contract gave the airline an indefinite license over the photos and a twelve-month license over the videos. Id. In 2024, Travly, an online travel agency, paid Steinars $10,000 to license ten of her works. Id. at 8. That same year, Icelandic Water Holdings paid her $45,880 to film a promotional video, post that video on her Instagram page, and license that work to the company for two years. Id. at 9. Finally, in 2025, a social media marketing agency paid her €41,300 to produce, post, and license an unspecified number of works. Id. at 12. Taken together, these invoices provide a sufficient anchor from which a reasonable factfinder could determine the market value of infringed works without too much guesswork. See Dash, 731 F.3d at 318 ("To survive summary judgment on an

actual damages claim, a copyright holder must show that the thing taken had a fair market value. Evidence of the owner's prior sale or licensing of copyrighted work will satisfy this burden when it is sufficiently concrete." (cleaned up)).

Tripscout advances several counterarguments. None are persuasive. The company is correct that Steinars' invoices are not perfect comparators. See Def.'s Reply at 21. None reflects a license for the works allegedly infringed in this case, and some include compensation for services beyond licensing, such as content production and posting. But Steinars need not identify a dead ringer to survive summary judgment. See, e.g., On Davis, 246 F.3d at 166–67 (holding that a single, materially different prior license provided sufficient evidence of market value); Durant v. Greenfield & Fortenberry, LLC, No. 16-cv-965 (RP), 2018 WL 3155822, at *5 (W.D. Tex. June 28, 2018) (same). It suffices that the invoices provide evidence that Steinars' work "generally had fair market value"—one that has seemingly increased over time as her fame grew. Dash, 731 F.3d at 318. Nor does the inclusion of payments for other services in some of the invoices render all the invoices irrelevant for purposes of estimating market value. A reasonable jury is capable of disaggregating the license-related compensation from amounts attributable to production, posting, travel expenses, or other non-license services and assigning the invoices the weight it finds appropriate.

At bottom, Steinars "was not required to establish the actual value; [she] was required only to provide sufficient evidence of the value so that the jury [would] not have to resort to undue speculation in estimating actual damages." McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 567 (7th Cir. 2003). She has met that burden. Though there remains some uncertainty about the exact amount of actual damages Steinars deserves, that does not bar recovery as a matter of law. See On Davis, 246 F.3d at 167 ("Given our long-held view that in

assessing copyright damages courts must necessarily engage in some degree of speculation, some difficulty in quantifying the damages attributable to infringement should not bar recovery." (cleaned up)); see also 6 Patry on Copyright § 22:101 ("In fixing the appropriate amount of damages, absolute precision is not required: a defendant who willfully misappropriates another's property should not avoid the consequences of its wrongful act merely because some guesswork is required."); 5 Nimmer on Copyright § 14.02[A][3] ("Uncertainty will not preclude recovery of actual damages if the uncertainty is as to amount, not as to whether actual damages are attributable to the infringement.").

Tripscout next contends that "there is no evidence [it] would have paid for such a license." Def.'s Reply 21. Maybe so. But that is irrelevant because, as the name "hypothetical-license theory" suggests, a plaintiff need not show that the parties actually would have agreed to a license—instead, a willing buyer is assumed. See Oracle, 765 F.3d at 1088–89.

Finally, Tripscout argues it is entitled to summary judgment on Steinars' lost-license theory because she is barred by Federal Rules of Civil Procedure 26 and 37 from presenting that damages theory at trial. See Def.'s Reply 22–25. This argument misses the mark, too. Rule 26(a) requires a plaintiff to disclose, among other things, her categories and theories of damages. See Arm. Assembly of Am., Inc. v. Cafesjian, 746 F. Supp. 2d 55, 66–71 (D.D.C. 2010). If an initial disclosure under Rule 26(a) is "incomplete or incorrect," the plaintiff must supplement or correct her disclosure unless the corrective information has already "been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Steinars violated these rules, according to Tripscout, by failing to "disclose [her] lost license fee theory of damages." Def.'s Reply 25. But even "assum[ing] arguendo that [Steinars] improperly failed to disclose [this] damage theory," it does not follow that she cannot present it to a jury.

Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999). Rather, "[i]f a party fails to provide information . . . required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, *unless the failure was substantially justified or is harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added). This Court has "broad discretion to determine whether a nondisclosure is substantially justified or harmless." Smith v. Athena Constr. Grp., Inc., No. 18-cv-02080 (APM), 2025 WL 4666326, at *6 (D.D.C. Feb. 5, 2025) (collecting cases). The guiding consideration is fair notice. See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003) (explaining that "the basic purpose of Rule 37(c)(1)" is "preventing surprise and prejudice to the opposing party").

Any purported violation of Rule 26 was harmless because Tripscout "was on notice in multiple ways" that Steinars was pursuing a hypothetical-license measure of damages. Smith, 2025 WL 4666326, at *7. Steinars' initial disclosures refer Tripscout to her complaint "for an itemization" of the damages she suffered, Def.'s Reply at 23, and her complaint in turn includes the list of all the works Tripscout copied without a license. To be sure, Steinars could have been more precise at the outset. But the hypothetical-license theory of damages she was gesturing toward became increasingly clear during the discovery process. When Tripscout asked Steinars for documents "sufficient to show any and all damages" that she suffered, for instance, she produced and referred Tripscout to the invoices discussed above. Def.'s SUMF ¶ 17; Def.'s MSJ, Ex. G, Tripscout's RFP No. 16. Tripscout plainly understood the significance of that evidence, as it devoted a substantial portion of Steinars' deposition to probing those invoices and their bearing on her claimed damages. See Steinars Tr. 394:1–408:22. Because Tripscout was "clearly aware" Steinars might measure her actual damages using historic licensing arrangements, any violation of Rule 26 was "harmless." Cafesjian, 746 F. Supp. 2d at 71; see

also Woodworker's Supply, 170 F.3d at 993 (permitting presentation of damages theory not properly disclosed under Rule 26 where defendant "knew" about the theory). In sum, Steinars may present her lost-license theory of damages at trial.

*2. Indirect Profits*

Steinars may also try to disgorge Tripscout of any ill-gotten gains. Section 504(b) "provides for two distinct monetary remedies—actual damages and recovery of wrongful profits." Polar Bear, 384 F.3d at 707–08. Because "Congress made clear that the two subjects—profits and damages—are entirely separate," Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., 807 F.2d 1110, 1118 (2d Cir. 1986), a defendant who seeks summary judgment on both remedies must say so explicitly. In its summary judgment motion, however, Tripscout argued only that Steinars "cannot meet her burden of proving *actual damages* as a matter of law." Def.'s MSJ at 18 (emphasis added). In other words, it did *not* argue that Steinars is barred from disgorging the company's infringement-derived profits at trial. See id. at 17 ("[A]t best, Plaintiff is only entitled to *actual damages and defendant's profits* for each of the alleged infringements []. However, Plaintiff failed to carry her burden of proving *actual damages* as a matter of law." (emphasis added)).

True, Tripscout claims that it [redacted] Def.'s MSJ at 25. But the Court declines to construe that aside as an argument for summary judgment on Steinars' ability to recover profits traceable to the infringements. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." Modeste v. Tesla, Inc., No. 26-cv-2177 (CRC), 2026 WL 2415733, at *2 (D.D.C. Aug. 18, 2026) (cleaned up). So Tripscout's profit argument, "raised in a single, conclusory statement without further development, is forfeited and need not be addressed." Id.

And Tripscout's attempt to further develop that argument in reply cannot save it from forfeiture. See Swick v. U.S. Dep't of the Army, 596 F. Supp. 3d 66, 75 n.2 (D.D.C. 2022).

Even if the Court divined an argument for Tripscout, it fails in any event. Whether Tripscout [redacted] is irrelevant, as § 504(b) concerns net gains from the *infringement*—not company-wide profits. Taylor, 712 F.2d at 1121. Said another way, the relevant "profit" is the incremental gain attributable to the infringing activity—that is, the amount by which the posts of Steinars' work left Tripscout better off than it otherwise "would have been without the infringement." On Davis, 246 F.3d at 167; see also 4 Nimmer on Copyright § 14.03[A][1] ("The purpose of the award of defendant's profits is to prevent the infringer from unfairly benefiting from a wrongful act."). And "[c]osts that the defendant did not incur because it infringed a copyright are considered profits for this purpose." Roeslin v. District of Columbia, 921 F. Supp. 793, 799 (D.D.C. 1995). So even if Tripscout [redacted] . . . that g[i]ve[s] it no immunity from accounting for any profits made by the infringement merely because they were less than enough to make its entire business profitable." Wilkie v. Santly Bros., 139 F.2d 264, 265 (2d Cir. 1943).

Tripscout's secondary point—that Steinars "failed to prove any profits," Def.'s MSJ at 25—flips the burden of proof on its head. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's *gross revenue*, and the infringer is required to prove [its] deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b) (emphasis added). So if Steinars pursues Tripscout's tainted proceeds at trial and produces evidence of the company's gross revenues for the relevant time period, see, e.g., Pl.'s Waliszewski Tr. 40:3–41:23, the burden would be on

*Tripscout* to prove that it reaped no financial fruits from infringing Steinars' works, see Stenograph, 144 F.3d at 103.

Tripscout's argument in reply fares no better. It contends that Steinars has failed to show any of its revenue was related to its repeated infringement. See Def.'s Reply at 27–28. Not only is this argument forfeited, Twin Rivers Paper Co. LLC v. SEC, 934 F.3d 607, 615 (D.C. Cir. 2019) (explaining that arguments "are forfeited if raised for the first time in reply"), it is also unpersuasive. A plaintiff survives summary judgment on a demand for indirect profits if she proffers "non-speculative evidence to support a causal relationship" between the infringements and revenues generated indirectly from those infringements. Mackie v. Rieser, 296 F.3d 909, 916 (9th Cir. 2002). Put another way, Tripscout may obtain summary judgment only if "there exists no conceivable connection between the infringement[s]" and its revenues. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). The record, however, shows a plausible causal connection.

Tripscout is a for-profit business that makes money when people book hotels through the platform linked on its social media pages. See Pl.'s Waliszewski Tr. 38:2–41:6; Def.'s Resp. ¶ 22. It does not "def[y] credulity" that some people who booked trips through @hotel did so because Tripscout incorporated Steinars' content on its social media pages. Bouchat, 346 F.3d at 525 n.10. Tripscout presumably would not have posted Steinars' content on dozens of occasions unless her works had some positive impact on its revenues or engagement. Nor would it have incessantly reached out to Steinars for collaboration opportunities and permission to use her work, including multiple times after she told Tripscout in no uncertain terms that she was not interested. See Pl.'s MSJ, Vera Ex. 1 at 11–35. Although the causal chain is by no means airtight, it is "conceivable" nonetheless because it is "at least hypothetically possible." Bouchat,

346 F.3d at 524; accord Dash, 731 F.3d at 330. Courts routinely credit broad causal links such as this one at summary judgment when the infringer uses a creator's work to promote its brand. See, e.g., Letsch v. S. Proper Hosp. Grp., LLC, No. 21-cv-1840 (TJK), 2024 WL 2746798, at *11–15 (D.D.C. May 29, 2024) (collecting and discussing cases).

To drill down how much of Tripscout's revenue could be attributed to Steinars' works with more precision, one would need, at a minimum, the analytical data associated with the infringements. But Tripscout destroyed most of this evidence when it deleted—rather than archived—many of the posts. This "undermine[d] [Steinars'] ability to prove . . . Tripscout's profits from any alleged infringement," as the Court previously explained. Sanctions Op. at 9. Because Tripscout should have known to preserve those posts and Steinars was prejudiced from its failure to do so, the Court sanctioned Tripscout by allowing Steinars to present "evidence to the jury concerning the loss of this engagement data." Id. It should go without saying that Tripscout may not obtain summary judgment based on an evidentiary gap that its own failure to preserve evidence helped create. See Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998) ("[H]olding the prejudiced party to too strict a standard of proof [at summary judgment] . . . would allow parties who have . . . destroyed evidence to profit from that destruction.").

In sum, Steinars is "entitled to recover infringing profits to the extent any such profits can be demonstrated, and that calculation is . . . reserved for a trier of fact and is not appropriate for summary judgment." Silberman v. Innovation Luggage, Inc., No. 1-cv-7109 (GEL), 2003 WL 1787123, at *10 (S.D.N.Y. Apr. 3, 2003). "Given the many factors that draw" users to a social media page, "it may well be that the finder of fact will conclude" that Steinars' content "played a quite limited role—or even no role at all—in generating revenue for" Tripscout, "and so the profits that can be attributed to the infringement are small to nonexistent." Letsch, 2024 WL

2746798, at *13; see, e.g., Walker v. Forbes, Inc., 28 F.3d 409, 410–11 (4th Cir. 1994) (affirming indirect profits award equal to 0.086% of revenues). But that is for a jury to decide.

*3. Statutory Damages*

A copyright owner may choose statutory damages instead of actual damages and profits. 17 U.S.C. § 504(c)(1). The ordinary range is $750 to $30,000 for each work infringed, id., no matter how many ways or times the defendant infringed it, see Walt Disney Co. v. Powell, 897 F.2d 565, 569 (D.C. Cir. 1990). If the copyright owner proves willfulness, the ceiling rises to $150,000. 17 U.S.C. § 504(c)(2). Within those bounds, the factfinder has broad discretion to set the award as justice requires. See Harrison Music Corp. v. Tesfaye, 293 F. Supp. 2d 80, 83 (D.D.C. 2003); see, e.g., Spanski, 883 F.3d at 916–18 (affirming statutory damages of $60,000 per infringed episode because the infringement was willful).

Statutory damages are available only where (1) the copyright owner registered her work before the infringement occurred, or (2) the infringement occurred within three months of first publication and registration was made within those three months. 17 U.S.C. § 412. Steinars concedes that "some" of her claims do not qualify for statutory damages. Pl.'s MSJ at 28. That is an understatement. Only five of her fifty-three claims—Infringement Nos. 8, 9, 24, 52, and 53—are eligible. See Def.'s Infringement Table at 2–9; Def.'s Reply at 18 & n.4.

Willfulness turns on the infringer's state of mind. A defendant infringes willfully when it knows it is infringing, recklessly disregards whether it is doing so, or deliberately blinds itself to the risk of infringement. VHT, 918 F.3d at 748. Because direct proof of intent is rare, willfulness is usually inferred from the defendant's conduct and the surrounding circumstances. See N.A.S. Imp., Corp. v. Chenson Enters., Inc., 968 F.2d 250, 252 (2d Cir. 1992). When those facts support competing inferences, as is almost always the case, the question belongs to a jury.

See, e.g., Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 264 (2d Cir. 2005); ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc., No. 16-cv-54 (EGS), 2022 WL 3025241, at *22 (D.D.C. Apr. 27, 2022).

Tripscout says Steinars cannot establish willfulness for any of the five eligible infringements. Def.'s MSJ at 25–26. Not true. Tripscout's primary argument is a reprisal of its Shaggy defense: "It Wasn't Me"—it was merely the contractors it hired to run the pages. See id. at 26. But, as the Court explained in discussing extraterritoriality and volition, see supra Sections III.A, III.B.3, outsourcing your infringing to foreign contractors is not a get-out-of-liability-free card. This argument is no more convincing on repeat at the damages stage, as a corporation's willfulness can likewise be proven through the actions of its employees or contractors. See, e.g., Spanski Enters., Inc. v. Telewizja Polska S.A., 222 F. Supp. 3d 95, 106 (D.D.C. 2016) (employees); Nixon v. Source Digital, Inc., No. 23-cv-5218 (JPC), 2025 WL 2602967, at *2 (S.D.N.Y. Sept. 9, 2025) (contractors).

To be sure, Tripscout's social media accounts are operated pursuant to Tripscout's policies and procedures, see Pl.'s SUMF ¶¶ 25–33, 40–45, and Tripscout points out that it had various internal safeguards in place to prevent copyright infringement by its contractors, see Def.'s SUMF ¶ 6; Def.'s Reply at 28. From this, a jury might ultimately conclude that the infringements were merely negligent—not willful. But for Tripscout to win at summary judgment, the Court must find that "no reasonable jury could" side with Steinars. Sturdza v. United Arab Emirates, 281 F.3d 1287, 1297 (D.C. Cir. 2002). Tripscout does not clear that high bar, as the evidence also permits the opposite conclusion. Some evidence suggests these policies were either ineffective or disregarded: (1) Tripscout's accounts infringed Steinars' works at least fifty-two times; (2) eight infringements occurred after Steinars explicitly told Tripscout she did

not consent to having her content reposted, including Infringement Nos. 52–53, which occurred *after* Steinars filed suit, Def.'s Infringement Table at 9; and (3) Tripscout's staff continued to contact Steinars for permission to use her content and collaborations despite her being on Tripscout's "red flag" list, see Pl.'s MSJ, Vera Ex. 1 at 11–35, 44; Pl.'s Reply 22. Based on this evidence, a jury could infer willful blindness or reckless disregard. On the flipside, the Court declines Steinars' request to find the two "post-commencement infringements to be willful as a matter of law," Pl.'s MSJ at 32, as a jury could just as easily side with Tripscout.

All told, Steinars is eligible for either (1) actual damages under a lost-license theory and Tripscout's wrongfully obtained profits or (2) statutory damages for Infringement Nos. 8, 9, 24, 52, and 53. She can present both to the jury, and she has up until final judgment to pick which one she would like. 17 U.S.C. § 504(c)(1); Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 347 n.5 (1998).

## IV. Conclusion

Many moons ago, Asa Steinars asked Tripscout to pay her €54,000 for copying dozens of her works without a license. Tripscout declined, saying that "under U.S. copyright law . . . this is not a case that will hold up in court." Pl.'s Emails at 7. Absent a late-breaking settlement, a jury will decide who was right. For the foregoing reasons, the Court will grant in part and deny in part Tripscout's motion for summary judgment and Steinars' cross-motion for partial summary judgment. A separate Order shall accompany this memorandum opinion.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 25, 2026